Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for the recovery of manufacturers’ excise taxes paid by it during the period November 1, 1951, to December 31,1954. The plaintiff was not a manufacturer in the ordinary sense of fabricating new products out of new materials. It was one of the large number of enterprises, large and small, which rebuild useful parts for automobiles and other automotive equipment, using mostly items which have been junked or traded in because they were no longer operative, and inserting in them such new parts or usable old parts as are necessary to make them work.
The portion of the plaintiff’s busines here relevant was the rebuilding of generator armatures, starter armatures, and clutch pressure plates, and complete generators, starters and clutch pressure assemblies. The plaintiff sold the rebuilt armatures and plates, or the complete generators, starters and clutch pressure assemblies, to the wholesale trade. Our question is whether what the plaintiff did in its process of rebuilding these objects constituted the plaintiff a “manufacturer” of them, within the meaning of section 3403(c), as amended, of the Internal Eevenue Code of 1939, 26 U.S.C. (1952 ed.) §3403, and section 4061(b) of the Internal Revenue Code of 1954, 26 U.S.C. § 4061 (b), which sections subject automobile “parts and accessories” to the manufac *540 tures’ excise tax. Tire fact that the items sold by the plaintiff were automobile accessories is clear. The question is whether the plaintiff “manufactured” them. The statutes do not define the word manufacturer. Treasury Regulations 46 (1940 ed.) section 316.4 says:
The term “manufacturer” includes a person who produces a taxable article from scrap, salvage, or junk material, as well as from new or raw material, (1) by processing, manipulating, or changing the form of an article, or (2) by combining or assembling two or more articles.
The plaintiff’s method of operation was to disassemble completely the old parts which came to its plant, discarding the unusable pieces and placing the usable pieces in separate bins from which they could be taken for the assembly of a rebuilt part. The plaintiff’s processes in rebuilding the items here in question are described in detail in our findings, and only one of them, that relating to generators, will be described in this opinion. It is reasonably typical, although there were, naturally, many differences in the processes used in rebuilding the different items here in question.
The generators rebuilt by the plaintiff in the period involved here were usually received in its plant as dirty, greasy, and worn-out units. Each unit was disassembled, cleaned, and then sent to the assembly department for the replacement of any worn-out parts. At that point, the fields were replaced with new fields on which excise taxes had been paid or with salvaged fields that were retaped. The fields were inserted in the case by means of field shoes, brushes were placed in the brush racks, the bearing was pressed into the bearing end, and bushings were pressed in the bushing end. Finally, the armature was pressed in, the case was bolted together, and the entire unit was examined for performance.
Aside from plaintiff’s rewinding of the generator armature, plaintiff performed no rewinding or machining in rebuilding generators sold by it.
It is fairly evident, considering all the things that the plaintiff did in making a salable and usable generator out of a number of components, themselves useless until subjected to the plaintiff’s labor and skill and supplemented by *541 additional material, that it requires no stretch, of the meaning of words to say that the plaintiff “manufactured” a generator. The Government urges, and we agree, that it is relevant, in the interpretation of the statute, that the business of rebuilding automobile accessories is big business, and that the products of these rebuilding enterprises compete extensively and successfully with the new products, unquestionably subject to the excise tax, of manufacturers of those new products.
There is an aspect of the case which troubles us greatly. In June 1954, after the plaintiff had been paying the tax on its products for several years, it requested a ruling from the Internal Revenue Service, Excise Tax Division, as to its liability for excise taxes on its sale of generators and starters. It seems to have stated the facts fairly, and received an answer from the Chief, Excise Tax Branch, Internal Revenue Service, as follows:
In reply to your first question it is considered that no tax is due on the sale by the rebuilder of a rebuilt automobile generator or starter. If the rebuilder rewinds the armatures which he owns and uses them in rebuilding the generators and starters, tax under section 3403(c) of the Code applies to his sale of such rewound armatures.
In reply to Question 2, where the rebuilder buys armatures tax paid and uses them in the rebuilding of generators and starters, he incurs no liability for manufacturers’ excise tax on his sale of the rebuilt generators and starters.
In October 1954 the plaintiff requested a ruling as to the taxability of its sales of rebuilt clutch pressure assemblies. It received a reply from the same official, dated January 19, 1955, who cited Revenue Ruling 54-329, 195A-2 Cum. Bull. 405, published in Revenue Bulletin No. 33 on August 16, 1954, to the effect that “no tax applies to sales of used clutch pressure plate assemblies which are merely disassembled, cleaned, and reassembled, whether or not the clutch pressure plates are machined and worn parts are replaced with tax-paid parts.”
In December 1954 the Excise Tax Branch of the Internal Revenue Service, in response to a request from a supplier *542 of the plaintiff for rulings on several subjects pertinent to the plaintiff and other customers of the supplier, advised the supplier that the products were nontaxable. Eevenue Euling 55-98, 1955-1 Cum. Bull. 524, published in 1955, was specific to the effect that if a generator accepted in an exchange is disassembled and cleaned, the armature is rewound or replaced with a rewound armature, and the generator is then reassembled, repainted and sold for $10, the excise tax is applicable only to $1.50 of the sale price, the price of the rewound armature.
In July 1955 the plaintiff filed claims for refund of taxes paid on the products covered by the rulings recited above.
In 1956, Eev. Eul. 56-189, 1956-1 Cum. Bull. 503 was issued. It said:
The Internal Eevenue Service has reconsidered Eeve-nue Euling 54-329, C.B. 1954-2, 405, and Eevenue Euling 55-98, C.B. 1955-1, 524, particularly with reference to the taxability of reassembled generators containing armatures rewound by the reassemblers and rebuilt clutch assemblies. As a consequence of such reconsideration, the Service has now concluded that the positions taken in these rulings as applied to reassembled generators and rebuilt clutch assemblies are not sound.
Therefore, it is held that the manufacturers’ excise tax applies to the rebuilder’s sale of a reassembled generator containing an armature rewound by the reas-sembler, and to a rebuilt clutch assembly. Eevenue Euling 55-98 is. revoked and Eevenue Euling 54-329 is modified accordingly.
Because of reliance which may have been placed on these Eevenue Eulings by generator and clutch re-builders, the instant ruling will not be applied to sales occurring prior to June 1, 1956, except that any tax which may have been paid by generator rebuilders on generators containing armatures rewound by them or by clutch rebuilders will not be refunded.
On January 1,1957, the plaintiff’s claims for refund were rejected.
We have, then, a situation in which the taxing authorities have completely reversed positions taken both in official published Eevenue Eulings and in individual rulings made to the plaintiff. Since the position finally taken was probably a sounder interpretation and application of the statute *543 than the earlier position, the earlier rulings may properly be regarded as errors of law. In Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183, the Court held that “The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law.” In Helvering v. N.Y. Trust Co., 292 U.S. 455, 468, the Court held that Kevenue Rulings do not commit the Department to any interpretation of the law, and referred to the cautionary notice published in every Cumulative Bulletin containing the Rulings. See also section 3791(b) of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) § 3791(b).
It would seem, then, that the Commissioner had the authority to make his new ruling retroactive, or nonretroactive, as seemed to him wise.
The Commissioner, however, made his ruling nonretroac-tive as to certain taxpayers and retroactive as to others, including the plaintiff. And the distinction was based solely upon whether the particular taxpayer had, or had not paid his taxes. We dealt with such an asserted basis for differentiating between taxpayers in Connecticut Railway and Lighting Co. v. United States, 135 Ct. Cl. 650, 653-654, and held that the promptly paying taxpayer could not be validly made the object of prejudicial discrimination.
We reach the same conclusion in this case. The plaintiff is therefore entitled to recover, with interest as provided by law, the taxes paid by it, which would not have been payable under Rev. Rui. 56-189, if that ruling had not been made retroactive as to the plaintiff, and judgment to that effect will be entered for the plaintiff. The amount of recovery will be determined pursuant to Rule 38 (c).
It is so ordered.
Durfee, Judge; Laramore, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Exchange Parts Company of Fort Worth, is a Texas corporation which has its principal office in Fort *544 Worth. During the period from November 1, 1951, to December 31, 1954, plaintiff was engaged in the automotive parts rebuilding business in Fort Worth, Texas. A part of said business consisted of the rebuilding of generator armatures, starter armatures and clutch pressure plates. The plaintiff sold these rebuilt parts to the wholesale trade as separate parts. In addition, the plaintiff rebuilt generators, starters and clutch pressure assemblies as complete rebuilt units. In rebuilding these complete units, the plaintiff assembled generator armatures, starter armatures and clutch pressure plates with other tax-paid new parts. The plaintiff sold these rebuilt generators, starters and clutch pressure assemblies to the wholesale trade as complete rebuilt units.
2. Plaintiff duly filed manufacturers’ excise tax returns for the period November 1,1951, to December 31, 1954, with the District Director of the Internal Eevenue Service at Dallas, Texas, and paid the excise taxes shown to be due thereon. Plaintiff paid such excise taxes on the entire sales prices of starters, starter armatures, generators, generator armatures, and clutch pressure assemblies.
On July 25,1955, plaintiff mailed to the District Director of the Internal Eevenue Service in Dallas, Texas, in proper form, claims for refund of all of the excise taxes paid on the sales prices of starters and starter armatures and for the refund of a portion of the excise taxes paid on sales of generators, generator armatures, and clutch pressure assemblies during the period stated above. The date stamps on the claims for refund show that they were received by the Internal Eevenue Service on July 27, 1955. On January 7,1957, the Commissioner of Internal Eevenue sent plaintiff notices by registered mail that such claims for refund had been disallowed in full.
3. In rebuilding starter armatures during the period in suit, plaintiff employed the following processes:
(a) removal of dirt, grease, and grime from the unit;
(b) soldering of any broken coils or the replacement of the coils with coils from other salvaged armatures;
(c) inspection of the shaft alignment and straightening of the shaft on a machine, or in cases where the shaft was *545 bent to the point that it could not be straightened, pressing out the old shaft and inserting a new shaft;
(d) polishing the unit and sanding the commutator (a piece of copper at the end of the armature).
In rebuilding the starter armatures, no rewinding or machining was done by plaintiff.
4. In rebuilding starters during the period involved here, plaintiff first disassembled the part by removing the armature, the field, and the old brushes. After the various components were cleaned, they were assembled in the assembly department and, at that point if it was found the fields were reusable, they were rewrapped with field tape but, if not, they were replaced with fields on which an excise tax had already been paid. New brushes were then put in the unit and the starter armature was inserted with a Bendix drive. The completely assembled unit was then tested for performance.
In the rebuilding of the starters, no rewinding or machining was done by plaintiff.
5. The first step employed by plaintiff in the rebuilding of generator armatures during the period in suit was the removal of the copper wire. After this, the commutator was pressed off and paper was placed in the slots around the armature to insulate the wires from the metal lamination. Next, a machine was used for rewinding wire in the slots; then a pegging machine inserted pegs (consisting of manila paper) in the slots for holding the wire. After this process, the armature went to a press which pressed a commutator on the end of the armature core. The lead connectors were then connected by wire with the commutator and the wires were soldered to the various slots of the commutator in the soldering department. Next, the unit was dipped in varnish, baked for a number of hours, and cleaned and polished. The part was then placed on a turning lathe for smoothing out the commutator and removing excess varnish from it. As a final step, the unit was inspected for shorts and grounds and polished again.
6. The generators rebuilt by plaintiff in the period involved here were usually received in its plant as dirty, greasy, and worn-out units. Each unit was disassembled, cleaned, *546 and then sent to tbe assembly department for the replacement of any worn-out parts. At that point, the fields were replaced with new fields on which excise taxes had been paid or with salvaged fields that were retaped. The fields were inserted in the case by means of field shoes, brushes were placed in the brush racks, the bearing was pressed into the bearing end, and bushings were pressed in the bushing end. Finally, the armature was pressed in, the case was bolted together, and the entire unit was examined for performance.
Aside from plaintiff’s rewinding of the generator armature as explained in the preceding finding, plaintiff performed no rewinding or machining in rebuilding generators sold by it.
7. During the period involved here, plaintiff rebuilt clutch pressure assemblies of two types — the finger type and the diaphragm type. In rebuilding the finger type assemblies, the units were disassembled by the removal of the cover, the springs, the fingers, and the plates. After all parts were cleaned, the springs were subjected to pressure to determine whether they met the manufacturer’s specification for reusable springs; if not, they were replaced with new ones. The next step was a machine operation in which plaintiff ground the clutch plates for the purpose of smoothing out plates that had become worn and pitted by contact with the clutch disc during operation. The clutch plates were ground where, after the machining was completed, the plate had a remaining specified thickness; otherwise, it was replaced with a new pressure plate. At this point, the unit was assembled by setting the springs in the plate and attaching the fingers, consisting of old reusable fingers or new ones where replacement was necessary. The cover was then set over the springs and the unit was compressed in a machine and bolted together. After this assembly, a gauge was used to see that the fingers were of sufficient height to engage the throw-out bearing. As a last step, the unit was sent to a balancing machine where it was balanced.
The rebuilding of the diaphragm type clutch pressure assembly differed from the finger type only in that a diaphragm was used instead of fingers. The diaphragm was subjected to pressure to determine whether the pressure required for flexing the diaphragm met factory specifications. Where the *547 old diaphragm did not comply with such specifications, it was replaced with a new one. The unit was assembled, bolted together, and balanced in a balancing machine.
In the rebuilding of both the finger and diaphragm type clutch pressure assemblies, the only part machined by plaintiff was the clutch plate which, as described above, was reground by plaintiff.
8. In rebuilding clutch discs during the period covered by this suit, the unit was first cleaned and the old facing, composed of asbestos and a binder, was removed. The spline was inspected to determine whether it was in workable condition, and the springs were examined for the purpose of replacing any broken springs with new ones. Where fins on the disc were broken, they were replaced with fins salvaged from another unit. The salvaged fins were riveted in place. As a final step, a new facing was riveted on and the disc was inspected for balance.
In rebuilding the clutch disc, plaintiff performed no rewinding or machine operations.
9. About 20 percent of the total price of the clutch pressure assemblies rebuilt and sold by plaintiff was represented by the value of the machined pressure plates used in the rebuilding of the clutch pressure assemblies. In addition to their use in clutch pressure assemblies, the machined pressure plates were sold as separate wholesale items.
10. Plaintiff’s trade area includes parts of Texas, Oklahoma, Louisiana, and New Mexico. In 1949, approximately 275 automotive parts rebuilders in Kansas, Missouri, Oklahoma, Arkansas, Louisiana, New Mexico and Arizona formed an association for the purpose of obtaining uniform rulings from the Bureau of Internal Bevenue with respect to excise taxes. The objective of the association was to get all re-builders on the same basis for excise tax purposes. Information exchanged by members during meetings of the association showed that many of the small rebuilders neither collected nor paid any excise taxes and that in the beginning, the larger operators paid excise taxes on outright sales but not on the sale of exchange parts, which consisted of parts furnished by the jobber to the rebuilder who returned the rebuilt parts to the jobber.
*548 In 1949, the District Office of the Burean of Internal Revenue at Dallas, Texas, began auditing the records of many of the automotive rebuilders in Texas and Oklahoma to determine whether they had paid excise taxes due. It was found that the larger concerns had generally paid excise taxes, but in the course of the auditing, the Bureau found that many of the rebuilders had filed no excise tax returns and paid no taxes. Some of these were small operators who were not able to employ accountants or attorneys.
11. In the period pertinent to this action, the prices for the products sold by plaintiff were based on production costs and competition from other rebuilders in the trade territory, competition being the more important of the two factors. It was a highly competitive business and plaintiff could not price itself out of the market.
12. Effective November 1, 1951, the Federal excise taxes were raised from five percent to eight percent. A comparison of plaintiff’s price lists in effect prior to November 1, 1951, with its price lists in effect subsequent thereto does not reflect overall increases in plaintiff’s prices sufficient to compensate for the increase in excise taxes. Plaintiff’s prices in effect on November 8, 1951, represented an overall increase of only 35/100 of one percent over the prices contained in the preceding price list of May 21, 1951. The prices shown on plaintiff’s price lists effective September 8, 1952, represented an increase of only 23/100 of one percent over the prices that became effective November 8, 1951.
If plaintiff had increased its prices on November 8,1951, by the amount needed to offset the increase in excise taxes, plaintiff would have been undersold by its competitors who were rebuilding the same parts. At the time the tax increase occurred and for a period of about eight months thereafter, plaintiff was selling rebuilt generators below the cost of production. This was done because plaintiff was trying to produce rebuilt generators of better quality than those sold by its competitors and elected to sell the parts below cost for a time until its customers discovered that its generatoi’s were of superior quality.
The summary of plaintiff’s price lists applicable during the period covered by this action shows that the price of some *549 items was reduced, that tbe price of others remained the same, that the prices of some parts were first reduced and then increased, and that the prices of other parts were increased and later decreased. Plaintiff’s selling prices were generally dictated by competitive conditions in the industry.
13. During the period from November 1,1951 to December 31, 1954, all but three of the price lists issued by plaintiff stated that the prices quoted by plaintiff included Federal excise taxes. The statement was included on the printed price lists to avoid confusion among plaintiff’s customers and to reduce their inquiries about excise taxes. Plaintiff’s customers and prospective customers had constantly inquired whether plaintiff planned to add Federal excise taxes to its quoted prices. In response to these inquiries, plaintiff advised its customers that it paid the Federal excise taxes and did not pass such taxes on to the customer either in its invoices or its price lists.
In plaintiff’s price list of December 4, 1950, covering exchange clutch plates, its price list of April 10,1952, covering exchange matched sets, and its price list of April 10, 1952, covering exchange clutch pressure assemblies, no mention was made of Federal excise taxes. The omission was inadvertent and was due to plaintiff’s failure to note that the printer’s proof of these price lists did not state that the quoted prices included Federal excise taxes.
14. During the entire time pertinent to this action, plaintiff invoiced its customers for rebuilt parts the amounts shown on plaintiff’s current price lists. In none of its invoices to customers did the plaintiff bill Federal excise taxes as a separate item.
15. During the years in suit, public accountants who prepared plaintiff’s financial statements treated Federal excise taxes as expenses of doing business — in the same way as interest on loans and other expenditures. The accountants followed this procedure because of information furnished by plaintiff’s management to the effect that the excise taxes were not passed on to plaintiff’s customers. Had the accountants been advised that the excise taxes were passed on to the customers, the accountants would have shown the taxes *550 as liabilities to be treated in tbe same manner as Social Security and withholding taxes.
16. In connection with its excise tax returns, plaintiff did not make separate daily computations of such excise taxes but determined the taxes due for each reporting period on the basis of plaintiff’s aggregate net sales for the taxable items involved.
The accounting method followed by plaintiff in reporting and paying the excise taxes involved in this action was as follows: plaintiff first determined the net sales of taxable items to customers by deducting freight allowances, discounts, etc., from invoice prices. Plaintiff then divided the aggregate net sales of the taxable items by 108 and multiplied the quotient by 8 to obtain the gross excise tax due. From the gross excise tax so computed, plaintiff deducted excise taxes it had paid to its suppliers on items purchased from them, and the remainder represented the excise tax reported and paid by plaintiff. For example, plaintiff’s net sales to customers of taxable parts in 1952 amounted to $213,-797.15, on which plaintiff computed gross excise taxes of $15,836.70 ($213,797.15 divided by 108X8). Plaintiff then deducted taxes it had paid directly to suppliers in the amount of $2,127.82, leaving net excise taxes reported and paid by plaintiff for the year of $13,708.88 (plaintiff’s exhibits 14 and 43). The same method was used by plaintiff for all the years in suit.
The manner in which plaintiff computed the taxes shows that the total excise taxes paid by plaintiff during the period in suit were included in plaintiff’s net bills to its customers. If the excise taxes paid by plaintiff had not been included in plaintiff’s net sales, plaintiff would have calculated and paid its excise taxes on the basis of eight percent of its net sales of taxable rebuilt parts, less taxes paid on suppliers’ invoices. Thus, for the year 1952, plaintiff would have taken eight percent of $213,797.15 and determined that its gross excise taxes were $17,103.77. After deducting $2,127.82 for excise taxes included in the purchase price of parts bought from its suppliers, plaintiff would have paid a total excise tax of $14,975.95 in 1952 instead of the $13,708.88 it actually paid.
*551 17. By letter dated June 29,1954, plaintiff requested a ruling from the Internal Bevenue Service, Excise Tax Division, as to plaintiff’s excise tax liability on sales of rebuilt automotive generators and starters. In plaintiff’s letter, the following questions were presented:
$ # * * #
1st.
If there are no rewinding or machining operations involved in rebuilding an auto generator or starter other than that involved in the armature, a component part; is excise tax due and payable on the sale of a rebuilt generator or starter, as a complete unit, or is tax on the sale of an auto generator or starter due and payable only on the armature, the taxable component part used in such a generator or starter; providing in each case, the armature, generator or starter is the property of the rebuilder ?
2nd.
There being no machine operations on merely assem-blying [sic] an automotive generator or starter, does excise tax apply to the sale of a generator or starter where the rebuilder assembles a generator or starter using a purchased armature, on which excise tax has been paid.
* * * * *
Plaintiff’s inquiry was answered by letter dated September 29, 1954, signed by B. J. Bopp, Chief, Excise Tax Branch, Internal Bevenue Service, and stating in pertinent part as follows:
In reply to your first question it is considered that no tax is due on the sale by the rebuilder of a rebuilt automobile generator or starter. If the rebuilder rewinds the armatures which he owns and uses them in rebuilding the generators and starters, tax under section 3403 (c) of the Code applies to Ms sale of such rewound armatures.
In reply to Question 2, where the rebuilder buys armatures tax paid and uses them in the rebuilding of generators and starters, he incurs no liability for manufacturers’ excise tax on his sale of the rebuilt generators and starters.
18. By letter dated October 11, 1954, plaintiff requested a ruling from the Internal Bevenue Service regarding the applicability of the manufacturers’ excise tax to plaintiff’s sales *552 of rebuilt clutch pressure assemblies. Plaintiff’s letter stated in part:
A clutch pressure assembly consists of a cast iron clutch plate, cover, springs release levers, bolts, etc. The only part of a clutch pressure assembly that is machined is the cast iron clutch plate. After the cast iron clutch plate is machined, a clutch pressure assembly is made by merely assemblying [sic] the above mentioned various parts with the cast iron clutch plate.
If a rebuilder sells a clutch pressure assembly which has been assembled in his own plant using a cast iron clutch plate, (machined in his own plant) and other required tax paid component parts, does excise tax apply to the sale of the complete assembly or merely to the sale value of the cast iron clutch plate contained in the complete assembly ?
May we call to your attention that the above situation parallels the situation now existing in the sale of generators where excise tax applies only to the sale value of the armature contained in a generator?
In reply to its request, plaintiff received a letter from the Internal Revenue Service, dated January 19, 1955, signed by Mr. Bopp and stating in part as follows:
You indicate that the unit is disassembled, the clutch pressure plate is machined, worn parts are replaced with tax-paid parts, and the unit is reassembled for sale. Since the clutch pressure plate is the only part which is machined, you ask whether tax applies only to the plate or to the entire assembly.
Under Revenue Ruling 54-329, published in Internal Revenue Bulletin No. 33, on August 16, 1954, we have concluded that no tax applies to sales of used clutch pressure plate assemblies which are merely disassembled, cleaned, and reassembled, whether or not the clutch pressure plates are machined and worn parts are replaced with tax-paid parts. However, tax does apply to machined clutch pressure plates which are sold by the rebuilder or are used by him as components of assemblies reconditioned for sale.
19. On December 24,1954, plaintiff received from its supplier, International Products & Mfg. Co., Chicago, Illinois, a copy of a letter of December 16, 1954, from the Internal Revenue Service, Excise Tax Branch, to the supplier. The letter was a response to requests submitted by the supplier *553 to the Internal Eevenue Service for rulings as to the applicability of the manufacturers’ excise tax to sales of rewound armatures, of armatures rebuilt by the insertion of preformed coils and of the preformed coils. Omitting the introductory paragraph, the letter from the Internal Eevenue Service to the supplier read as follows:
You state that you have received many requests from rebuilders all over the country as to the taxability of the above items. In your letter of October 26,1954, you described in detail the operations of armature rebuilding.
We have been advised by numerous armature rewind-ers that filing an armature commutator, if ever practiced, is now obsolete. We now hold that merely turning down a commutator is not an operation which would render a person liable for tax on his sale of an armature.
As stated in our published ruling, Eev. Eul. 54-329, a copy of which is enclosed, reboring or other machining, rewinding and comparable major operations performed on used parts being processed for sale or for use as components of other articles for sale are defined as rebuilding operations constituting manufacture for purposes of the tax. The person owning parts being rebuilt for such disposition is the rebuilder (manufacturer) and is liable for the tax on his sales of the rebuilt parts or on his use as components of other articles manufactured by him for sale. The tax applies whether the machining, etc., operations are performed by the re-builder himself or by some other person in his behalf.
It is further stated in the above ruling that the manufacturers’ excise tax applies to rewound armatures. The decision has also been reached that the insertion of preformed coils in armatures is a rebuilding operation. Eewound armatures and armatures rebuilt by the insertion of preformed coils are subject to tax under section 3403(c) of the Code when sold by the rewinder or re-builder, or when used by him as a component of another article manufactured by him for sale.
Preformed coils for use in armatures are not considered to be automobile parts or accessories within the meaning of section 3403(c) of the Code. The manufacturer’s sales of such articles are, therefore, not subject to tax under that section of the law.
20. The rulings issued to plaintiff by the Internal Eevenue Service on September 29, 1954, and January 19, 1955, had the effect of reducing plaintiff’s Federal excise tax liability by a considerable amount. However, plaintiff made no *554 changes in its price lists after the receipt of such rulings to reflect the reduction in its excise tax liability.
21.The following table shows (a) the manufacturers’ excise taxes which plaintiff paid on its sales of starters, starter armatures, generators, generator armatures, and clutch pressure assemblies; (b) plaintiff’s computation in its claims for refund of the amount of excise taxes due, and (c) the overpayment of taxes as stated in its claims for refund:

22. In computing the overpayment of excise taxes claimed by plaintiff for the period November 1,1951, to December 31, 1954, on the sales of starters and starter armatures, plaintiff took the position that it owed no excise taxes on such rebuilt parts, because no machining or rewinding was performed in the rebuilding operation. Plaintiff had paid excise taxes on the total sales prices of these rebuilt parts and, therefore, plaintiff made a claim for the full amount of excise taxes it had paid on the sales of starters and starter armatures.
23. In computing the overpayment of excise taxes claimed by plaintiff on the sales of generators in the period from November 1, 1951, to December 31, 1954, plaintiff took the position that it owed excise taxes only on the value of generator armatures which had been rewound by plaintiff, rather than on the full sales prices of the complete generators. Since plaintiff had paid excise taxes on the full sales prices of these parts, plaintiff claimed an overpayment of the difference between the taxes on the full sales prices and the taxes *555 on the value of the generator armature only. The small amount of refund claimed by plaintiff on generator armatures (table in finding 21) resulted from the sales of salvaged armatures which were not rewound by plaintiff.
24. In computing the overpayment of excise taxes claimed by plaintiff on the sales of clutch pressure assemblies during the period in suit, plaintiff took the position that its tax liability was limited to taxes due on the value of the machined pressure plate rather than the full sales price of the clutch pressure assembly. Since plaintiff had paid excise taxes on the entire sales prices of the assemblies, its claim for refund was for the difference between the taxes as paid and the taxes due on the value of the machined pressure plate only. As shown in the table in finding 21, plaintiff also claimed a refund of excise taxes paid on “matched sets.” A matched set consisted of a clutch pressure assembly and a clutch disc. No machining or rewinding was performed by plaintiff in the rebuilding of clutch discs. Since plaintiff had paid excise taxes on the entire sales price of matched sets, it claimed an overpayment of the difference between the amount of such taxes and the tax applicable to the value of the machined pressure plates used in the rebuilding of the clutch pressure assemblies.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover with interest thereon as provided by law and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 7, 1961, that judgment for the plaintiff be entered for $26,838.88, together with interest thereon as provided by law from the various dates of payment.